**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUPER 8 WORLDWIDE, INC., formerly known as SUPER 8 MOTELS, INC., a South Dakota Corporation, | : <br> : <br> : Civil Action No. 16- |
| Plaintiff, | : |
| v. | : |
| VEDANTKUSH, INC., a Pennsylvania Corporation; PRAMOD A. PATEL, an individual; and HEMLATA P. PATEL, an individual, | :     **VERIFIED** <br> :     **COMPLAINT** <br> : <br> : |
| Defendants. | : |

Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., by its attorneys, LeClairRyan, complaining of defendants Vedantkush, Inc., Pramod A. Patel, and Hemlata P. Patel, says:

**PARTIES, JURISDICTION AND VENUE**

1.     Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., ("SWI") is a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business in Parsippany, New Jersey.

2.     Defendant Vedantkush, Inc. ("Vedantkush"), on information and belief, is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 6542 Ethel Street, Canton, Ohio.

3.      Defendant Pramod A. Patel ("P. Patel"), on information and belief, is a principal of Vedantkush and a citizen of the State of Ohio, having an address at 6542 Ethel Street, Canton, Ohio.

4.      Defendant Hemlata P. Patel ("H. Patel"), on information and belief, is a principal of Vedantkush and a citizen of the State of Ohio, having an address at 6542 Ethel Street, Canton, Ohio.

5.      The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Vedantkush by virtue of, among other things, section 17(d) of the October 13, 1995 franchise agreement by and between Vedant, Inc. and SWI, as assigned to Vedantkush (the "Franchise Agreement"), described in more detail below, pursuant to which Vedantkush has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.      This Court has personal jurisdiction over P. Patel and H. Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which P. Patel and H. Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

9.      Venue is proper in this District pursuant to section 17(d) of the Franchise Agreement, inasmuch as that provision contains an express waiver by Vedantkush of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Super 8® Marks

10.   SWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

11.   SWI owns and has the exclusive right to license the use of the service mark SUPER 8 and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Super 8® Marks"), as well as the distinctive Super 8® System, which provides guest lodging services to the public under the Super 8® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.

12.   SWI or its predecessors first used the SUPER 8 MOTEL mark in 1973, and the Super 8® Marks are in full force and effect.  Certain of the registered Super 8® Marks are incontestable pursuant to 15 U.S.C. § 1065.

13.   SWI has given notice to the public of the registration of the Super 8® Marks as provided in 15 U.S.C. § 1111.

14.   SWI uses or has used the Super 8® Marks as abbreviations of its brand name.

15.   Through its franchise system, SWI markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, SWI allows its franchisees to utilize the Super 8® Marks and to promote the Super 8® brand name.

16.   SWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to

3

cause consumers throughout the United States to recognize the Super 8® Marks as distinctly designating SWI guest lodging services as originating with SWI.

      17.     The value of the goodwill developed in the Super 8® Marks does not admit of precise monetary calculation, but because SWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of SWI's goodwill exceeds hundreds of millions of dollars.

      18.     The Super 8® Marks are indisputably among the most famous in the United States.

### The Agreements Between The Parties

      19.     On or about October 13, 1995, SWI entered into the Franchise Agreement with Vedant, Inc. for the operation of a 101-room[1] Super 8® guest lodging facility located at 135 Hotel Lane, Clarion, PA, designated as Site No. 08417-99404-03 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

      20.     On or about December 3, 2002, SWI entered into an assignment and assumption agreement (the "Assignment and Assumption Agreement") with Vedant, Inc. and Vedantkush, in which Vedantkush assumed Vedant, Inc.'s rights and obligations under the Franchise Agreement for the Facility. A true copy of the Assignment and Assumption Agreement is attached hereto as Exhibit B.

      21.     Pursuant to section 5 of the Franchise Agreement, Vedantkush was obligated to operate a Super 8® guest lodging facility for a twenty year term, during which time Vedantkush was permitted to use the Super 8® Marks in association with the operation and use of the Facility as part of SWI's franchise system.

---

[1] The number of rooms at the Facility was subsequently corrected to 99.

4

22.     Pursuant to sections 7 and 18(C), and Schedule C of the Franchise Agreement, Vedantkush was required to make certain periodic payments to SWI for royalties, system assessments, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

23.     Pursuant to section 7(c) of the Franchise Agreement, Vedantkush agreed that interest is payable "on any past due amount payable to [SWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

24.     Pursuant to section 3(i) of the Franchise Agreement, Vedantkush was required to prepare and submit monthly reports to SWI disclosing, among other things, the amount of gross room revenue earned by Vedantkush at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to SWI.

25.     Pursuant to section 3(i) of the Franchise Agreement, Vedantkush agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3(h) and 3(i) of the Franchise Agreement, Vedantkush agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

26.     Section 13 of the Franchise Agreement specified Vedantkush's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Super 8® Marks.

27.     Pursuant to section 17(d) of the Franchise Agreement, Vedantkush agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees,

incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

28.     Effective as of the date of the Assignment and Assumption Agreement, P. Patel and H. Patel provided SWI with a Guaranty of Vedantkush's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit C.

29.     Pursuant to the terms of the Guaranty, P. Patel and H. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the [Franchise] Agreement."

30.     Pursuant to the terms of the Guaranty, P. Patel and H. Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by SWI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Expiration and Termination of the Franchise Agreement

31.     By letter dated September 24, 2014, a true copy of which is attached as Exhibit C, SWI notified Vedantkush that the Franchise Agreement was set to expire and terminate on June 22, 2015, pursuant to the terms of the Franchise Agreement.

32.     By letter dated May 5, 2015, a true copy of which is attached as Exhibit D, SWI notified Vedantkush that the Franchise Agreement would expire and terminate on June 22, 2015, and advised Vedantkush that (a) it was to discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as a Super 8® System facility, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Super 8® System facility, (b) all items bearing the Super 8® Marks had to be removed, (c) all signs and any listings in directories and similar

6

guides in which the Facility was identified as a Super 8® had to be changed, (d) it had to de-identify the Facility within 14 days after expiration of the Franchise Agreement, and (e) demand was made for all outstanding Recurring Fees before the date of expiration.

33.     On or about June 22, 2015, the Franchise Agreement expired and terminated.

34.     At the time of the termination of the Franchise Agreement, Vedantkush failed to properly de-identify the Facility and owed Recurring Fees to SWI pursuant to the Franchise Agreement.

35.     The termination of the Franchise Agreement precludes Vedantkush from any further use of the Super 8® Marks in or around the Facility.

36.     The termination of the Franchise Agreement precludes Vedantkush from any further use of the Super 8® Marks to induce the traveling public to use the Facility in any way.

37.     Since the termination of the Franchise Agreement, Vedantkush has continued to use the Super 8® Marks to induce the traveling public to rent guest rooms at the Facility.

38.     Since the termination of the Franchise Agreement, Vedantkush has used the Super 8® Marks without authorization to rent rooms through, among other things, failure to remove Super 8® signage and continuing to identify the Facility as a Super 8® guest lodging facility.

39.     Vedantkush has continued to misuse the Super 8® Marks despite receiving notification from SWI to cease and desist from the misuse of the Super 8® Marks.

## FIRST COUNT

40.     SWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 39 of the Verified Complaint.

41.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any

reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

42.     Vedantkush marketed, promoted, and rented, and continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Super 8® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

43.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

44.     The acts of Vedantkush in marketing, promoting, and renting rooms at the Facility, through and with the Super 8® Marks, constitute:

> a)   a false designation of origin;
>
> b)   a false and misleading description of fact; and
>
> c)   a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of Vedantkush's Facility with SWI, and to cause confusion, or to cause mistake, or deception, to the effect that SWI sponsors or approves of the guest lodging services that Vedantkush provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

45.     Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

46.     Vedantkush's use of the Super 8® Marks in connection with goods and services at the Facility, after the Super 8® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Super 8® Marks, and lessened and will continue to lessen the capacity of the Super 8® Marks to identify and distinguish the goods and services of SWI, all in violation of Section 43(c) of the Lanham Act.

47.     Vedantkush's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

48.     Vedantkush's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on SWI.

49.     SWI has no adequate remedy at law.

50.     No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), SWI demands judgment against Vedantkush:

a)     Preliminarily and permanently restraining and enjoining Vedantkush, its affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act

in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8® Marks; and

b)    Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

51.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 50 of the Verified Complaint.

52.    Pursuant to sections 3(h) and 3(i) of the Franchise Agreement, Vedantkush agreed to allow SWI to examine, audit, and make copies of Vedantkush's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

53.    Vedantkush has engaged in acts and practices, as described, which amount to infringement of the Super 8® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

54.    As a result, Vedantkush owes restitution and the disgorgement of profits, in an amount unknown to SWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Vedantkush.

**WHEREFORE**, SWI demands judgment ordering that Vedantkush account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8® Marks.

10

## THIRD COUNT

55.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 54 of the Verified Complaint.

56.     Pursuant to sections 7 and 18(C), and Schedule C of the Franchise Agreement, Vedantkush was obligated to remit Recurring Fees to SWI.

57.     Despite its obligation to do so, Vedantkush failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $52,426.35.

58.     Vedantkush's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged SWI.

        **WHEREFORE**, SWI demands judgment against Vedantkush for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $52,426.35, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

59.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 58 of the Verified Complaint.

60.     At the time of the termination of the Franchise Agreement, Vedantkush was obligated to pay SWI Recurring Fees.

61.     Despite its obligation to do so, Vedantkush failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $52,426.35.

62.     In addition, Vedantkush benefited from its wrongful use of the Super 8® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to SWI in return for that benefit.

63.     Vedantkush's failure to compensate SWI constitutes unjust enrichment and has damaged SWI.

WHEREFORE, SWI demands judgment against Vedantkush for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $52,426.35, together with interest, attorneys' fees, costs of suit, and all royalties and other Recurring Fees that should be paid to compensate SWI for the period during which Vedantkush misused the Super 8® Marks and was thereby unjustly enriched, together with interest and costs of suit.

## FIFTH COUNT

64.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 63 of the Verified Complaint.

65.     Pursuant to the terms of the Guaranty, P. Patel and H. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Vedantkush under the Franchise Agreement.

66.     Despite their obligation to do so, P. Patel and H. Patel have failed to make any payments or perform or cause Vedantkush to perform each obligation required under the Franchise Agreement.

67.     Pursuant to the Guaranty, P. Patel and H. Patel are liable to SWI for Vedantkush's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $52,426.35, and for those additional Recurring Fees attributable to the period during which Vedantkush has misused the Super 8® Marks.

WHEREFORE, SWI demands judgment against P. Patel and H. Patel for damages in the amount of:

a)      All Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit; and

b)      All profits, royalties, and other Recurring Fees that should be paid to compensate SWI for the period during which Vedantkush misused the Super 8® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

68.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 67 of the Verified Complaint.

69.     On or about June 22, 2015, the Franchise Agreement expired and terminated.

70.     Section 13(b) of the Franchise Agreement provides that, when the Franchise Agreement is terminated, SWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Vedantkush did] not remove[] or obliterate[] within five days after termination."

71.     Vedantkush continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Super 8® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

72.     Vedantkush's unauthorized use of the Super 8® Marks has inflicted and continues to inflict irreparable harm on SWI.

**WHEREFORE**, SWI demands judgment declaring that SWI, or its authorized agent, has the right, without prior notice to Defendants, to enter the property at the Facility and

13

remove any and all exterior signage, exterior items and other exterior materials displaying the Super 8® Marks.

> LeClairRyan
> Attorneys for Plaintiff,
> Super 8 Worldwide, Inc.,
> formerly known as Super 8 Motels, Inc.
>
> By:_____
> **BRYAN P. COUCH**

Dated:

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

> LeClairRyan
> Attorneys for Plaintiff,
> Super 8 Worldwide, Inc.,
> formerly known as Super 8 Motels, Inc.
>
> By:_____
> **BRYAN P. COUCH**

Dated:

## VERIFICATION

STATE OF NEW JERSEY    )
                          ) ss:
COUNTY OF MORRIS       )

        **SUZANNE FENIMORE**, of full age, being duly sworn according to law, upon her oath, deposes and says:

        I am Senior Director of Contracts Compliance for Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., which is plaintiff in this action.

        I have read the foregoing Verified Complaint and all the allegations contained therein.  Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of SWI and/or information available through employees of SWI.

                         **SUZANNE FENIMORE**

Sworn and subscribed to before
me this 5th    day of May, 2016

            NOTARY PUBLIC

CINDY J. O'CONNOR
Notary Public
State of New Jersey
My Commission Expires Feb. 13, 2020

# Exhibit A

Location: Clarion, Pennsylvania
Unit No.: _8417_____
Entity No. _17857_

## SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _____ 10|13, 1995, is between SUPER 8 MOTELS, INC., a South Dakota corporation ("we", "our" or "us"), and Vedant, Inc., a Pennsylvania corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earlier to occur of the Term's expiration or termination of this Agreement. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

**2. Exclusive Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage or license someone to operate any Chain Facility anywhere outside the Protected Territory without restriction or obligation to you. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. There are no territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are mutually dependent; if you breach this Section, your protected Territory will be the Location only.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

(a) **Improvements.** You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The pre-opening phase of conversion and renovation must be completed, and the Facility must be ready to open for business under the System no later than ninety (90) days after the Effective Date. All renovations will comply with System Standards,

cooverl0.s8 10/94

1

the Approved Plans and any Punch List attached to this Agreement.  Your general contractor or you must carry the insurance required under this Agreement during renovation.  You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection before we consider the Facility to be ready to open under the System.  If you do not commence or complete the conversion and renovation of the Facility by the dates specified in this Section 3, or the Facility does not meet the pre-opening quality assurance inspection standard or the post opening quality assurance inspection standard and complete the post-opening improvements specified in the Punch List, after the Opening Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation.  You will pay us an extension fee of $2.00 per room for each day of any such extension.  This fee will be payable to us on each 30 day anniversary of the commencement of the extension.  In addition, if any fee is accrued and outstanding when the Facility opens under the System, you will pay us such amount within ten days after the Opening Date.  The grant of an extension will not waive any other default existing at the time the extension is granted.

(b)  **Improvement Plans.**  You will create plans and specifications for the work described in Section 3(a) (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.  Any material variation from the Approved Plans requires our prior written approval.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

(c)  **Pre-Opening.**  You may identify the Facility as part of the System prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval, or as permitted under and strictly in accordance with the System Standards Manual.

(d)  **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer lodging and other services of the Facility to the public in compliance with the law and System Standards.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards.  The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual.  You may add to or discontinue the services

convert10.s8 10/94

2

described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay.

(e) **Training.** You or one of your principal owners will attend at our request, at your expense for travel, meals and lodging, and at a mutually convenient time, an orientation program of not more than 3 days held in our offices. The Facility's general manager will attend the training program described in Section 4 (a). You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

(f) **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

(g) **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

(h) **Inspections and Audits.** You will permit our representatives to perform quality assurance inspections of the Facility and audit your financial and operating books and records (including tax returns), particularly those relating to the Facility, with or without prior notice of the inspection or audit. The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time. You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by the audit. You will pay the reasonable travel, lodging and meal expenses of our reinspection or audit and any reinspection fee we may impose if the Facility does not pass an inspection, you refuse to cooperate with our auditors or inspectors, or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees. We may publish or disclose the results of quality assurance inspections.

conver10.a8 10/94

3

(i) **Reports and Accounting.** You will prepare and submit timely Monthly Reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. We do not require that your financial statements be independently audited, but you will send us a copy of your audited statements if you have them audited and we ask for them.

(j) **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.

(k) **Conferences.** You or your representative will attend each System conference and pay the Conference Fee we set for the System franchisees, if and when we determine to hold a System conference. The fee will be the same for all U.S. facilities that we franchise. You will receive reasonable notice of a System conference.

(l) **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

(m) **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility.

(n) **Credit Card Programs.** You recognize that the Super 8 "VIP Card" credit card program is an integral part of the System. You will participate in the VIP Card program and other proprietary credit card programs we may require from time to time, subject to compliance with applicable law.

(o) **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will

conver10.s8 10/94

4

obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

(p) **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

(a) **Training.** Between 30 days prior to the projected Opening Date and 3 months afterwards, we will offer at a location in the United States we designate, and your representative (usually the general manager) must complete, a training program to our satisfaction. The training program will not exceed three weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may charge you a nominal fee for materials not to exceed $250.00 for each manager trainee. Any replacement general manager of the Facility must complete the training program within the time specified in the System Standards Manual. No tuition will be charged for your first participation in this training but you must pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits. We may conduct additional mandatory or optional training for your employees, including, subject to the availability of our training personnel, an optional property opening orientation at the Facility. We may charge tuition for training for replacement general managers, for training at mandatory sessions of more people than those we require to participate and for optional training. We may offer or sell to you video tapes, computer discs or other on-site training aids and materials. A portion of the Advertising and Reservation Fund proceeds, determined in our sole discretion, will be allocated to our training activities and related direct and indirect overhead expenses.

(b) **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer to or accept from callers to our general consumer, toll-free telephone number reservations for any lodging facilities other than Chain Facilities.

(c) **Marketing.** (1) We will use System Assessment Fees as specified in Schedule C, allocated in our discretion for the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of System publications and

directories of hotels, and for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

(2) We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

(3) We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

(4) We will use the System Assessment Fees to publish the Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

(d) **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

(e) **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

(f) **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives.

coover10.18 10/94

6

(g)  **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications.  We will lend you one copy of the System Standards Manual promptly after we sign this Agreement.  We will send you any System Standards Manual revisions and/or supplements as and when issued.  We will send you all other publications for System franchisees and all separate policy statements in effect from time to time.

(h)  **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3(h).  We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection.  We may impose a reinspection fee and will charge you for our reasonable costs of travel, lodging and meals for any reinspection, or for an audit if you pay less than 97% of the correct amount of Recurring Fees.  Our inspections are solely for the purposes of checking compliance with System Standards.

5.  <u>Term</u>.  The Term begins on the Effective Date and expires on the day prior to the 20th anniversary of the Opening Date.  Some of your duties and obligations will survive termination or expiration of this Agreement.  You will execute and deliver to us with this Agreement a notarized Declaration of Franchise Agreement in recordable form.  We will countersign and return one copy of the Declaration to you.  We may, at our option, record the Declaration in the real property records of the county where the Facility is located.  The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations.  NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.  <u>Application and Initial Fees</u>.  We should receive from you a non-refundable Application Fee of $1,000.00 which will be credited towards the Initial Fee.  You will pay us a non-refundable Initial Fee in the amount of $19,000.00, when you sign this Agreement, which is fully earned when we sign this Agreement.

7.  <u>Recurring Fees, Taxes and Interest</u>.

(a)     You will pay us certain "Recurring Fees" accruing from the Opening Date until the end of the Term, payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand.  Recurring Fees include the following:

        (1)  A "<u>Royalty</u>" equal to four percent (4%) of Gross Room Sales of the Facility accruing during the calendar month.

        (2)  A "<u>System Assessment Fee</u>" as stated in Schedule C to be paid into the Advertising and Reservation Fund.  Upon 60 days written notice, we may change the System Assessment

conver10.a8 10/94

Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C or to cover the cost of additional services or programs for Chain Facilities. At our option, you will also pay or reimburse us for travel agent commissions paid for reservations at the Facility and other fees levied to pay for reservations for the Facility originated or processed through other reservation systems and networks.

(b)     You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

(c)     "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

## 8. Indemnifications.

(a) Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

(b) You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

(c) We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim alleging that your proper use of the System and any property we license to you is an infringement of a third

conver10.a8 10/94

8

party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

cover10.a8 10/94

## 9.  Your Assignments, Transfers and Conveyances.

(a)  **Consent Required.**  This Agreement is personal to you (and your owners if a corporation, partnership or other entity).  You may finance the Facility without our consent.  You and your owners may, only with our prior written consent and after you comply with Sections 9 (c) and (f) do any of the following:  (1) Assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise; (2) Assign your leasehold interest in, lease or sublease all or any part of the Facility to any third party; and (3) Except as permitted in Sections 9(b) and (d) below, engage in a voluntary Equity Transfer.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent.  We may terminate this Agreement if and when you sell, convey, transfer or donate your right, title and interest in and to the Facility, with or without our consent, or an involuntary Equity Transfer occurs without our consent.

(b)  **Public Offerings and Registered Securities.**  You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000.  Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to paragraph (a) of this Section.

(c)  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent under this Section until we receive general releases from you and each of your owners, payment of our Application Fee and Transfer Fee then in effect, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise.  Before we consider your request for our consent to the transfer, the transferee must complete our Application, provide the same supporting documents as a new license applicant, sign the form of Franchise Agreement we then offer in conversion transactions and must agree to renovate the Facility as if it was an existing facility of similar age and condition converting to the System, as we determine.  We will not require renovations if the three most recent quality assurance inspection scores of the Facility average no worse than the Chain average for the calendar year preceding the date our approval of the transfer is requested.  Our consent to the transaction will not be effective until these conditions are satisfied.

(d)  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Transfer or Application Fee.  You also must not be in default and you must comply

with the procedures specified in Sections 9(c) and 9(f). Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

(e) **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

(f) **Notice of Transfers.** You will give us at least 30 days prior written notice of any transaction requiring our consent or to a Permitted Transferee. You will notify us when you sign a contract to sell or lease the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our Consent and notices of Permitted Transferee Transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent.

**11. Default and Termination.**

(a) **Default.** You will be in default under this Agreement if you do not pay us when a payment is due, you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed, or, in the case of quality assurance default, you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection to cure the default within 90 days after the inspection. We may terminate this Agreement if you do not perform that improvement agreement.

(b) **Termination.** We may terminate this Agreement, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11(a), (2) you discontinue operating the Facility as a "Super 8 Motel", (3) a guarantor on whom we are relying to enter into this Agreement dies or becomes incapacitated, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you contest in court the ownership or right to franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

(c) **Casualty and Condemnation.** You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 30 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 30 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty. You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority. The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

(d) **Other Remedies.** We may modify the Protected Territory granted in Section 2 if you violate your covenant in Section 2. We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment

conver10.18 10/94

or default. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may arbitrate to collect amounts due under this Agreement without first issuing a default or termination notice. our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

### 12. Liquidated Damages.

(a) **Generally.** If we terminate this Agreement under Section 11(b), or you terminate this Agreement (except under Section 11(c) or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 36 full calendar months (or the number of months remaining in the unexpired Term at the date of termination, whichever is less). If the Facility has been open for less than 36 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 36. You will also pay any applicable Taxes assessed on such payment. Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11(b). Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement are not affected.

(b) **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us Recurring Fees for a period of one year after we receive the initial notice of condemnation described in Section 11(c), or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but Recurring Fees must be paid when due until Condemnation is completed.

### 13. Your Duties At and After Termination. When this Agreement terminates for any reason whatsoever:

(a) **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow

convert10.18 10/94

13

the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.

(b) **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11(d). We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

(c) **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

(d) **Survival of Certain Provisions.** Sections 3 (h), (i), (m), 7, 8, 11(d), 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

(a) **Quiet Enjoyment.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.

(b) **This Transaction.** You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective franchisees. Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are

conver10.s8 10/94

14

relying to enter into this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement. You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

(c) **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

15. <u>**Proprietary Rights**</u>.

(a) **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

(b) **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No goodwill shall attach to any secondary designator that you use.

(c) **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses,

under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than the Location or, in the case of a Chain Facility of the same name, in the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

(d) **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

(e) **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

**16.  Relationship of Parties.**

(a) **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility

conver10.a8 10/94

16

for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

(b) **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

### 17. Legal Matters.

(a) **Partial Invalidity.** If any part of this Agreement, for any reason, is declared invalid or unenforceable, the remainder shall not be effected. However, if in our judgment such decision substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

(b) **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

(c) **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

**Vedant, Inc.:**
Your address:          I-80 and Exit 9, Clarion, PA 16214, Fax No. 216-339-7731, Attention: Naresh Patel

**Super 8 Motels, Inc.:**
Our address:          339 Jefferson Road, P.O. Box 278, Parsippany, New Jersey 07054-0278, Fax No. (201) 428-9579, Attention:  Vice President-Franchise Compliance

(d) **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all

conver10.s8 10/94

17

cases and controversies under this Agreement or between we and you not subject to arbitration.

(e) **Miscellaneous**. This Agreement will be governed by and construed under the laws of the State of New Jersey. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey. This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only. We may unilaterally revise Schedule C under this Agreement. This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

(f) **Arbitration.**

(1) We and you will submit any controversy or claim relating to the offer, sale, negotiation, performance, interpretation, enforcement, termination and validity of this Agreement and all related agreements between you and your guarantors, successors and assigns, and us, except claims for indemnification under Section 8, to binding arbitration before the American Arbitration Association under its commercial arbitration rules, or to any other mutually agreeable alternative dispute resolution organization under its rules. The scope of this agreement to arbitrate includes claims against your and our officers, directors, agents and employees, claims arising under any federal or state law or regulation, and claims by your employees, agents, shareholders, partners, lenders, heirs, personal representatives, spouses, other family members, successors and assigns against us. This arbitration will be the sole and exclusive remedy for any such controversy or claim. **A demand for arbitration must be filed by a party within one (1) year after the party discovers the conduct, act, event or occurrence first giving rise to the claim, but no later than two (2) years after the conduct, act, event or occurrence first giving rise to the claim occurs, or the right to any remedy will be deemed forever waived and lost. The time limit for collecting on our claims for Recurring Fees accruing during the Term will not commence until this Agreement terminates.**

(2) This arbitration clause will be governed exclusively by the Federal Arbitration Act, as amended. Arbitration shall take place in the regional office of the American Arbitration Association closest to the Facility before one arbitrator if the amount in controversy is less than $200,000.00 and before three arbitrators if the amount exceeds $200,000.00. The single arbitrator shall be selected by mutual agreement of the parties; the Association will select the arbitrator using the striking method if the parties cannot agree on the arbitrator within 15 days after the panel information is received by the parties. The parties will each select one person for the three person panel, who shall then together select the third within 10 days after the second panelist is named. The Association will select the third if no agreement is so reached as to the third panelist.

(3) The parties shall bear their own expenses of the arbitration, unless the arbitrators otherwise award the same. The arbitrators shall have no authority to award punitive or exemplary

damages against either party, or to amend or modify this Agreement. The decision of the single arbitrator, or the majority of the arbitrators of the panel shall be final and conclusive. The award may be confirmed, entered and enforced in any court of competent jurisdiction. This arbitration provision shall be self-executing and shall remain in full force and effect after the termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party, by default or otherwise, notwithstanding the failure to appear. We may file an action in a court of competent jurisdiction to protect the System or the Marks from infringement, unauthorized use or disclosure, or misuse, and we may obtain temporary restraining orders, preliminary and permanent injunctions, or other provisional remedies for such purposes, without awaiting the outcome of an arbitration.

(4) No arbitration under this Agreement shall include, by consolidation, joinder, or in any other manner, any person other than you and us, or persons claiming by or through you and us. To the extent permitted by applicable law, no issue of fact or law shall be given preclusive or collateral estoppel effect in any arbitration except as between the parties themselves or persons in direct privity of contract with them in arbitrations under this Agreement.

(5) The parties waive the right to a jury trial of any issue that is properly the subject of arbitration under this Agreement.

18.    SPECIAL STIPULATIONS

        Notwithstanding anything contained herein to the contrary, the following Special Stipulations shall be controlling over conflicting or inconsistent provisions of this Agreement and shall not be transferable or assignable to Your successor in interest: *TPh ¼/11/94*

        (A)    (Your Additional Termination Right) You may terminate this Agreement without *and FIFTEENTH* cause or penalty effective only on the **fifth and tenth** anniversary of the Opening Date provided You give Us at least six (6) months prior written notice of termination and You are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if this Agreement is properly terminated and You perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this paragraph will automatically terminate without notice if and as of the date (i) We send You a notice of termination under this Agreement, or this Agreement automatically terminates, (ii) You fail to cure any default under this Agreement within the time permitted, if any, in the notice of default We send You, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 275 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of less than 275 (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection. **After the third anniversary of the Opening Date, You may also terminate this Agreement if you are not in default and we are (or our successor is) the subject of a bankruptcy reorganization or receivership proceeding that is not dismissed written 90 days after filing. You must give 60 days prior written notice of termination and complete your**

post-termination obligations within 5 days after the effective date of termination. **You will pay no penalty or Liquidated Damages if you exercise this termination right properly.** *AND FIFTH/TEENTH* 11/11/94

(B)   (<u>Our Additional Termination Right</u>)  We may terminate this Agreement without cause or penalty effective only on the **fifth and tenth** anniversary of the Opening Date provided We give You at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  You will pay no Liquidated Damages if this Agreement is terminated and You perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

(C)   (<u>Limit on Advertising & Reservation Fund Increases</u>)  You will not be obligated to pay a System Assessment Fee in excess of 4.0% of Gross Room Sales.  We will not be obligated to provide the services associated with the portion of the System Assessment Fee that you don't pay.           *TPP 11/11/94*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
**SUPER 8 MOTELS, INC.:**

ATTEST: _____      BY: _____
(Assistant) Secretary                                Vice President


**YOU, as FRANCHISEE:**
Vedant, Inc.

Attest: _____      By: _____
                                                            Naresh Patel
                                                            President

## APPENDIX A

### DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, the "VIP Club" credit card program, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Approved Supplier means a vendor authorized by us to provide proprietary or Mark-bearing items, or whose goods and services are deemed to meet applicable System Standards.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

conver10.s8 10/94

21

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of Franchise Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

Effective Date means the date on which we and you have executed of this Agreement, or the date we insert in the Preamble of this Agreement.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which you or your owners sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you

merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 131 Bluebell Drive SW New Philadelphia, OH 44663, as more fully described in Schedule A.

conver10.18 10/94

23

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Protected Territory means to be determined.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, other reservation fees and charges, interest and Taxes as stated in Section 7.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4(b).

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

System means a comprehensive system for providing guest lodging facility services as we specify which at present includes: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7(b) to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7(c) of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

(Page 30 of 41)

<u>Transfer Fee</u> means the fee we charge for a transfer under this Agreement.  The Transfer Fee shall be equal to the Initial Fee unless we specify another amount in this Agreement, published policy or in the System Standards Manual.

<u>"You"</u> and <u>"Your"</u> means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

<u>"We"</u>, <u>"Our"</u> and <u>"Us"</u> means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

convert10.s8 10/94

26

## SCHEDULE A

(Legal Description of Facility)

conver10.18 10/94

27

## SCHEDULE B

PART I:      YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|-------------------------|
| Naresh Patel | 100% | common stock |

PART II:     THE FACILITY:

Primary Designation of Facility: Super 8 Motel

Number of approved guest rooms: 101

Parking facilities (number of spaces, description): 101

Other Amenities and facilities:

PART III:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
             COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

conver10.s8 10/94

28

REVISED ON NOVEMBER 11, 1994
SCHEDULE A
SUPER 8 MOTEL
PUNCHLIST SUMMARY
KNIGHTS INN
CLARION, PA
OCTOBER 25, 1994

| | |
|---|---|
| TOTAL ROOMS: | 99 |
| DOUBLE/DOUBLE: | 60 |
| SINGLE/DOUBLE: | 20 |
| SINGLE/DOUBLE W/SOFA: | 10 |
| SINGLE/DOUBLE W/KITT: | 9 |

## PROPERTY CONDITION SUMMARY:

This 17 year old original Knights Inn consists of 7 single story, double loaded guest room buildings constructed of wood. All appear to be structurally sound. The property will require extensive interior and exterior renovations.

Lobby Dimensions:        10' x 25'
Guest Room Dimensions:   12' x 34'

ITEMS TO BE COMPLETED PRIOR TO ENTERING THE SYSTEM

## PROPERTY EXTERIOR:                              ESTIMATED COST:

1.   Provide SUPER 8 MOTEL exterior signage. Signage must meet Company standards and be purchased from an approved vendor. No System signage may be installed until official opening and without approval. Property needs may vary, therefore cost not included in this estimate. De-identify existing property location.

2.   Property will require a comprehensive exterior renovation plan. Contact your RFS Regional Salesperson for renderings and recommendations; these renderings will become part of this punchlist. Alternative plans may be acceptable providing they are approved by the company. In addition the following is required:
     a.   Replace light fixtures.
     b.   Remove bars on entrance doors.

CLARION, PA;                    KNIGHTS INN
page two

**PROPERTY EXTERIOR CONT.:**

    c.    Photos of the completed exterior
        renovation must be provided prior to
        the entry inspection. The Property
        Opening Manager will provide a camera
        to the property for these photos.
    d.    Paint existing swimming pool fence to
        coordinate with new building decor.
    e.    Prior to opening swimming pool ensure
        there is seating for 8 adults. Price
        not included in estimate.                    $ 100,000

**PUBLIC AREAS:**

1.    Upgrade lobby/front desk area to include:
    a.    Refinish front desk. Eliminate dark
        laminate.
    b.    Eliminate key rack and install lockable
        key drawers.
    c.    Replace vinyl wall covering to include
        side lobby and restrooms. Minimum of
        20 oz. required. An approved light
        texture finish is an acceptable
        alternative.
    d.    Provide decorative window treatment.
    e.    Replace cracked sinks in restrooms.
    e.    Install a SUPER 8 MOTEL showcase in
        lobby area upon official opening.
    f.    Install a portable phone at the front
        desk for manager's use.                    4,000

2.    A gas detection system must be installed in
    each area where gas appliances exist in the
    property. This system must be wired to the
    front desk and managers apartment, if
    applicable, and operational prior to
    entering the System. A Company approved
    portable unit will be acceptable at this
    location.                                      500

3.    Install reservation system equipment per
    Company specifications. Reservation
    equipment must be purchased. Cost not
    included in this estimate.

CLARION, PA;                    KNIGHTS INN
page three

**PUBLIC AREAS CONT.:**
4.    Facilities to assist the handicapped must be
      provided in accordance with  Local and State
      codes.

5.    Replace ice machine when needed.  Super 8
      Motels require sanitary dispensing type ice
      machines.  One ice machine will be
      acceptable for this location.                          3,000

6.    Upgrade meeting room to include:
      a.    Replace vinyl wall covering.  Minimum
            of 20 ounces required.  An approved
            light texture finish is an acceptable
            alternative.  Remove all wood trim.
      b.    Replace furniture package.
      c.    Remove swag lamps.                               1,500

**GUEST ROOMS/BATHS:**

1.    Super 8 Motels require electronic/magnetic
      strip locksets for all new construction
      properties and anticipates that within 3 to
      5 years they will be adopted as a Super 8
      Motel standard for all properties.  You
      should take this into consideration if you
      anticipate and/or are required to change or
      upgrade your existing locking system.
      Current indicator locks are unacceptable.
      In the interim, replacing these deadbolts
      with a 1" throw separate keyed deadbolt
      (keyed for emergency access only) is
      acceptable providing it meets state and
      local codes.                                           2,000

2.    Install a non-keyed, 1" deadbolt lock in all
      connecting doors in addition to existing
      knob latch.  Operating knobs must be located
      on room side only with flush plates between
      doors.                                                 400

3.    Eliminate lock trim handles.  Cost not
      included in estimate.

4.    Replace entrance door room numbers with an
      approved plaque type.                                  1,500

CLARION, PA;                    KNIGHTS INN
page four

GUEST ROOMS/BATHS CONT.:
5.    Renovate guest rooms to include:
      a.   Eliminate all dark trim from walls and
           ceilings except doors and windows.
      b.   Replace vinyl wall covering to include
           bath area.  Minimum of 12 ounces
           required.  An approved light texture
           finish is an acceptable alternative.
      c.   Paint rooms to include doors, trim and
           ceilings.
      d.   Provide pictures. A minimum of one
           glass front, framed picture per
           headboard, two in a King bedded room is
           required.  Minimum size required is
           20" x 16".
      e.   Replace carpet as in 227 to eliminate
           any which are worn. Minimum 28 oz. cut
           pile, wall to wall carpet with pad is
           required.  Recommend 30 oz.
      f.   Replace casegoods to include credenzas,
           headboards, wall mirrors, desks,
           writing tables and nightstands.
           Nightstands, credenzas and desks must
           be free standing.  All casegoods must
           coordinate.
      g.   Replace leisure chairs.  Provide a
           minimum of two upholstered arm chairs.
           One arm chair may be substituted with
           a desk chair.  Vinyl is not acceptable.
      h.   Replace sleeper sofas.
      i.   Replace lamp package.  Provide 2 lamps
           per headboard wall, credenza lamp and a
           floor lamp at leisure area.  Eliminate
           all hanging lamps.  An acceptable
           option would be to install ceiling
           lights.
      j.   Replace HVAC covers as in 227.
      k.   Replace bedspreads and drapes where
           worn, torn, or severely stained.
           Quilted bedspreads and decorative
           blackout drapes are required.  Drapes
           and bedspreads must coordinate.
      l.   Replace mattress and boxsprings to
           eliminate any which have lost support.
      m.   A minimum of 40% of guest rooms must be
           prepared and designated as non-smoking
           rooms.                          186,600

CLARION, PA;                    KNIGHTS INN
page five

GUEST ROOMS/BATHS CONT.:
6.    Renovate bath area to include the following:
      a.    Remove or replace dated vanity
            cabinets.  Cost for replacement.
      b.    Replace vanity mirror.  A one piece
            mirror running the full length of the
            vanity is required.
      c.    Eliminate in ceiling lighting.  Provide
            a fluorescent vanity light.
      d.    Replace towel racks with a bar or shelf
            and bar combination.
      e.    Replace bath flooring.  Ceramic tile or
            sheet vinyl (minimum .085 gauge) are
            acceptable options. AS NEEDED TO ELIMINATE      44,100
            ANY THAT IS STAINED OR CURLING. 1/11/94 BB

BRAND STANDARDS:

      Property must comply with Brand Standards,
      including but not limited to, employee
      uniform package, amenities, logo'd supplies,
      and all signage/graphics.  Logo'd supplies
      must be available at the entry inspection
      but may not be placed in the guest rooms
      until official opening.                               5,100


RECOMMENDATIONS:

1.    Set up a display in the lobby to show the
      architectural renderings and interior design
      color boards for the proposed work and
      completion dates.                                     _____

2.    Provide informational signage to inform
      guests that work is underway and direct
      guest away from the construction area.                _____

3.    Renovate a couple of rooms to show guests
      and potential customers what they can expect
      in the future.                                        _____


                        PROPERTY TOTAL:        $ 348,700


**HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND WILL NOT BE CONSIDERED DURING FUTURE EVALUATION.  ANY AND
ALL REVISIONS TO THIS PUNCHLIST MUST BE MADE AND APPROVED BY THE
QUALITY ASSURANCE DEPARTMENT.**

## SCHEDULE C

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period.

Notwithstanding the above, upon 60 days written notice, after the tenth (10th) anniversary of the Effective Date of this Agreement, and at any later times, System Assessment Fee may be increased, in our sole discretion, on a System-wide basis to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

conver10.s8 10/94

## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments,  will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee.  We waive notice of amendment of the Agreement.   We acknowledge that Section 17 of the Agreement applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

We will not seek or accept indemnity, reimbursement or subrogation against Franchisee for any amount paid under this Guaranty unless and until 367 days have elapsed from the date you receive payment of such amount.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:

Guarantors:

_____(Seal)
Naresh C. Patel

_____

_____(Seal)

conver10.s8 10/94

30

**EXHIBIT B**

Schedule "B" of the Franchise Agreement is hereby amended as follows:

1.  Owners (names, addresses and percentage equity interests; attached separate exhibit if necessary):

    a.  Of Assignee:                                                      Ownership %

        Name:                        Pramod A. Patel                     51.00%
        Address:                     6542 Ethel Street NW
        City, State and Zip Code:    Canton, OH 44718


        Name:                        Hemlata P. Patel                    49.00%
        Address:                     6542 Ethel Street NW
        City, State and Zip Code:    Canton, OH 44718

## GUARANTY

As an inducement to Super 8 Motels, Inc. (the "Company") to execute the foregoing Assignment and Assumption Agreement, the undersigned, jointly and severally, hereby irrevocably and unconditionally (i) warrant to the Company and its successors and assigns that all of Assignee's representations and warranties in the Assignment and Assumption Agreement are true and correct as stated, and (ii) guaranty that all of Assignee's obligations as the substituted Franchisee (hereinafter referred to as "Franchisee") under the Franchise Agreement, including any amendments thereto whenever made (the "Agreement"), will be punctually paid and performed.

Upon default by Franchisee and notice from the Company, the undersigned will immediately make each payment and perform or cause Franchisee to perform, each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, the Company may without notice to the undersigned extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement, the giving of notice or demand by the Company for payment or performance by Franchisee, and acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the date of the above Agreement.

WITNESSES:                              GUARANTORS:

_____                 _____ (Seal)
                                          Pramod A. Patel

_____                 _____ (Seal)
                                          Hemlata P. Patel

# Exhibit

# B

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This "Agreement" is made and entered into as of Dec 3 , 200 2 by and among **VEDANT, INC.**, a Pennsylvania corporation ("Assignor"), **VEDANTKUSH, INC.**, a Pennsylvania corporation ("Assignee"), and **SUPER 8 MOTELS, INC.**, a South Dakota corporation (the "Company").

Recitals.  Assignor is the Franchisee under a Franchise Agreement, dated as of October 13, 1995 and a Software and Services Agreement, (collectively, the "Agreements") with the Company.  Assignor is also party to an Integrated System Agreement with the Company, which will be considered as one of the Agreements.  The Agreements are attached to this Agreement as Exhibit A and relate to the granting of a Super 8 System license for a lodging facility designated as Unit No. 8417 (the "Facility") to be developed at 135 Hotel Lane, Clarion, PA 16214.  Assignor is conveying the Facility to Assignee. Assignor desires to assign the Agreements to Assignee, which desires to assume and accept the rights and obligations under the Agreements, effective as of the date of this Agreement.

IN CONSIDERATION of the premises, the mutual promises in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.  Assignor assigns, transfers, bargains, sells, and delegates to Assignee all of its rights, title and interest in and to the Agreements, and its obligations existing and arising in the future, under the Agreements.

2.  Assignee accepts and assumes the rights, benefits and obligations of the Franchisee under the Agreements, effective as of the date of this Agreement, including all existing and future obligations to pay and perform under the Agreements.  Assignor shall remain secondarily liable for payment and performance of the Agreements.  The owners of Assignee have executed the Guaranty attached to this Agreement.

3.  To induce the Company to consent to this Agreement and the assignment of the Agreements, Assignee adopts and makes to the Company the representations and warranties of Franchisee set forth in the Franchise Agreement as of the effective date of this Agreement. Assignee is the owner of fee simple title to the Facility as of the effective date of this Agreement. Assignee's owners are shown on Exhibit B attached to this Agreement.

4.  Assignee will deliver, together with this Agreement, evidence of insurance meeting System Standards, as contemplated under the Agreements and the Super 8 System Standards Manuals.

5.  This Agreement shall be deemed a supplement to and modification of the Agreements. All references to "this Agreement" contained therein shall mean and refer to the original form of Franchise Agreement, Integrated System Agreement, or Software and Services Agreement, as the case may be, as modified by any prior amendments and addenda

and this Agreement. Except as expressly stated, no further supplements to or modifications of the Agreements are contemplated by the parties. There are no oral or other written arrangements between the Company and Assignor except as expressly stated in the Agreements and any written amendment or addendum thereto included as part of Exhibit "A". The Agreements, as previously modified, are incorporated by this reference.

6. Assignor and Assignee acknowledge that the Company has not participated in the negotiation and documentation of the transfer transaction between the parties, and has not made any representation or warranty, nor furnished any information to either party. Assignee waives any and all claims against the Company and its officers, directors, shareholders, affiliated corporations, employees and agents arising out of the transfer of the Facility. Assignee expressly acknowledges that the Company was not a participant in such transaction and that the Company has no liability in connection therewith. Assignee acknowledges that it has made such investigations of Assignor and the Facility as it believes appropriate.

7. Any notice required under the Agreements to be sent to Assignee shall be directed to:

> **ASSIGNEE:**
> **VEDANTKUSH, INC.**
> 6542 Ethel Street NW
> Canton, OH 44718
> Attn: Pramod A. Patel.

8. The Company consents to the assignment and assumption of the Agreements as provided in this Agreement. No waivers of performance or extensions of time to perform are granted or authorized. The Company will treat Assignee as the Franchisee under the Agreements. The License of Assignor under Section 1 of the Franchise Agreement will be terminated effective as of the date of this Agreement. The License Term of Assignee begins on the date of this Agreement and expires on the date the original License Term of Assignor expires.

**{SIGNATURE PAGE TO FOLLOW}**

**EXHIBIT A**

**THE AGREEMENTS**

Copies of Franchise Agreement, Software and Services Agreement, Integrated System Agreement and other related documents follow this page.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

**THE COMPANY:**

**SUPER 8 MOTELS, INC.**

By: _____        Attest: _____
    James D. Darby                                           Assistant Secretary
    Vice President
    Franchise Administration

**ASSIGNOR:**

**VEDANT, INC.**

By: _____        Attest: _____
    Naresh Patel                                            Assistant Secretary
    President

**ASSIGNEE:**

**VEDANTKUSH, INC.**

By: _____        Attest: _____
    Pramod A. Patel                                         Assistant Secretary
    President

Exhibit "A" - Franchise Agreement and related Agreements.
Exhibit "B" - Owners of Assignee
Guaranty

Location: Clarion, Pennsylvania
Unit No.: __8417__
Entity No. _17857_

## SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _____ 10 | 13, 19 95, is between SUPER 8 MOTELS, INC., a South Dakota corporation ("we", "our" or "us"), and Vedant, Inc., a Pennsylvania corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earlier to occur of the Term's expiration or termination of this Agreement. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

**2. Exclusive Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage or license someone to operate any Chain Facility anywhere outside the Protected Territory without restriction or obligation to you. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. There are no territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are mutually dependent; if you breach this Section, your protected Territory will be the Location only.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

(a) **Improvements.** You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The pre-opening phase of conversion and renovation must be completed, and the Facility must be ready to open for business under the System no later than ninety (90) days after the Effective Date. All renovations will comply with System Standards,

1

the Approved Plans and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection before we consider the Facility to be ready to open under the System. If you do not commence or complete the conversion and renovation of the Facility by the dates specified in this Section 3, or the Facility does not meet the pre-opening quality assurance inspection standard or the post opening quality assurance inspection standard and complete the post-opening improvements specified in the Punch List, after the Opening Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us an extension fee of $2.00 per room for each day of any such extension. This fee will be payable to us on each 30 day anniversary of the commencement of the extension. In addition, if any fee is accrued and outstanding when the Facility opens under the System, you will pay us such amount within ten days after the Opening Date. The grant of an extension will not waive any other default existing at the time the extension is granted.

(b) **Improvement Plans.** You will create plans and specifications for the work described in Section 3(a) (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

(c) **Pre-Opening.** You may identify the Facility as part of the System prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval, or as permitted under and strictly in accordance with the System Standards Manual.

(d) **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer lodging and other services of the Facility to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the services

conver10.s8 10/94

2

described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay.

(e) **Training.** You or one of your principal owners will attend at our request, at your expense for travel, meals and lodging, and at a mutually convenient time, an orientation program of not more than 3 days held in our offices. The Facility's general manager will attend the training program described in Section 4 (a). You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

(f) **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

(g) **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

(h) **Inspections and Audits.** You will permit our representatives to perform quality assurance inspections of the Facility and audit your financial and operating books and records (including tax returns), particularly those relating to the Facility, with or without prior notice of the inspection or audit. The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time. You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by the audit. You will pay the reasonable travel, lodging and meal expenses of our reinspection or audit and any reinspection fee we may impose if the Facility does not pass an inspection, you refuse to cooperate with our auditors or inspectors, or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees. We may publish or disclose the results of quality assurance inspections.

conver10.z8 10/94

3

(i) **Reports and Accounting.** You will prepare and submit timely Monthly Reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. We do not require that your financial statements be independently audited, but you will send us a copy of your audited statements if you have them audited and we ask for them.

(j) **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.

(k) **Conferences.** You or your representative will attend each System conference and pay the Conference Fee we set for the System franchisees, if and when we determine to hold a System conference. The fee will be the same for all U.S. facilities that we franchise. You will receive reasonable notice of a System conference.

(l) **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

(m) **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility.

(n) **Credit Card Programs.** You recognize that the Super 8 "VIP Card" credit card program is an integral part of the System. You will participate in the VIP Card program and other proprietary credit card programs we may require from time to time, subject to compliance with applicable law.

(o) **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will

obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

(p) **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

(a) **Training.** Between 30 days prior to the projected Opening Date and 3 months afterwards, we will offer at a location in the United States we designate, and your representative (usually the general manager) must complete, a training program to our satisfaction. The training program will not exceed three weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may charge you a nominal fee for materials not to exceed $250.00 for each manager trainee. Any replacement general manager of the Facility must complete the training program within the time specified in the System Standards Manual. No tuition will be charged for your first participation in this training but you must pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits. We may conduct additional mandatory or optional training for your employees, including, subject to the availability of our training personnel, an optional property opening orientation at the Facility. We may charge tuition for training for replacement general managers, for training at mandatory sessions of more people than those we require to participate and for optional training. We may offer or sell to you video tapes, computer discs or other on-site training aids and materials. A portion of the Advertising and Reservation Fund proceeds, determined in our sole discretion, will be allocated to our training activities and related direct and indirect overhead expenses.

(b) **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer to or accept from callers to our general consumer, toll-free telephone number reservations for any lodging facilities other than Chain Facilities.

(c) **Marketing.** (1) We will use System Assessment Fees as specified in Schedule C, allocated in our discretion for the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of System publications and

directories of hotels, and for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

(2) We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

(3) We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

(4) We will use the System Assessment Fees to publish the Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

(d) **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

(e) **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

(f) **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives.

conver10.a8 10/94

6

(g) **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for System franchisees and all separate policy statements in effect from time to time.

(h) **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3(h). We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our reasonable costs of travel, lodging and meals for any reinspection, or for an audit if you pay less than 97% of the correct amount of Recurring Fees. Our inspections are solely for the purposes of checking compliance with System Standards.

**5. Term.** The Term begins on the Effective Date and expires on the day prior to the 20th anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of Franchise Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6. Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00 which will be credited towards the Initial Fee. You will pay us a non-refundable Initial Fee in the amount of $19,000.00, when you sign this Agreement, which is fully earned when we sign this Agreement.

**7. Recurring Fees, Taxes and Interest.**

(a)    You will pay us certain "Recurring Fees" accruing from the Opening Date until the end of the Term, payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

(1) A "Royalty" equal to four percent (4%) of Gross Room Sales of the Facility accruing during the calendar month.

(2) A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund. Upon 60 days written notice, we may change the System Assessment

conver10.48 10/94

7

Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C or to cover the cost of additional services or programs for Chain Facilities. At our option, you will also pay or reimburse us for travel agent commissions paid for reservations at the Facility and other fees levied to pay for reservations for the Facility originated or processed through other reservation systems and networks.

(b)     You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

(c)     "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

## 8. Indemnifications.

(a) Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

(b) You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

(c) We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim alleging that your proper use of the System and any property we license to you is an infringement of a third

conver10.a8 10/94

8

party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

ccover10.a8 10/94

9

**9.   Your Assignments, Transfers and Conveyances.**

(a)  **Consent Required.**  This Agreement is personal to you (and your owners if a corporation, partnership or other entity).  You may finance the Facility without our consent.  You and your owners may, only with our prior written consent and after you comply with Sections 9 (c) and (f) do any of the following:  (1) Assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise; (2) Assign your leasehold interest in, lease or sublease all or any part of the Facility to any third party; and (3) Except as permitted in Sections 9(b) and (d) below, engage in a voluntary Equity Transfer.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent.  We may terminate this Agreement if and when you sell, convey, transfer or donate your right, title and interest in and to the Facility, with or without our consent, or an involuntary Equity Transfer occurs without our consent.

(b)  **Public Offerings and Registered Securities.**  You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000.  Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to paragraph (a) of this Section.

(c)  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent under this Section until we receive general releases from you and each of your owners, payment of our Application Fee and Transfer Fee then in effect, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise.  Before we consider your request for our consent to the transfer, the transferee must complete our Application, provide the same supporting documents as a new license applicant, sign the form of Franchise Agreement we then offer in conversion transactions and must agree to renovate the Facility as if it was an existing facility of similar age and condition converting to the System, as we determine.  We will not require renovations if the three most recent quality assurance inspection scores of the Facility average no worse than the Chain average for the calendar year preceding the date our approval of the transfer is requested.  Our consent to the transaction will not be effective until these conditions are satisfied.

(d)  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Transfer or Application Fee.  You also must not be in default and you must comply

conver10.a8 10/94

10

with the procedures specified in Sections 9(c) and 9(f). Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

(e) **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

(f) **Notice of Transfers.** You will give us at least 30 days prior written notice of any transaction requiring our consent or to a Permitted Transferee. You will notify us when you sign a contract to sell or lease the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our Consent and notices of Permitted Transferee Transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent.

**11. Default and Termination.**

(a) **Default.** You will be in default under this Agreement if you do not pay us when a payment is due, you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed, or, in the case of quality assurance default, you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection to cure the default within 90 days after the inspection. We may terminate this Agreement if you do not perform that improvement agreement.

conver10.s8 10/94

(b) **Termination.** We may terminate this Agreement, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11(a), (2) you discontinue operating the Facility as a "Super 8 Motel", (3) a guarantor on whom we are relying to enter into this Agreement dies or becomes incapacitated, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you contest in court the ownership or right to franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

(c) **Casualty and Condemnation.** You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 30 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 30 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty. You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority. The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

(d) **Other Remedies.** We may modify the Protected Territory granted in Section 2 if you violate your covenant in Section 2. We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment

or default. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may arbitrate to collect amounts due under this Agreement without first issuing a default or termination notice. our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

## 12. Liquidated Damages.

(a) **Generally.** If we terminate this Agreement under Section 11(b), or you terminate this Agreement (except under Section 11(c) or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 36 full calendar months (or the number of months remaining in the unexpired Term at the date of termination, whichever is less). If the Facility has been open for less than 36 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 36. You will also pay any applicable Taxes assessed on such payment. Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11(b). Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement are not affected.

(b) **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us Recurring Fees for a period of one year after we receive the initial notice of condemnation described in Section 11(c), or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but Recurring Fees must be paid when due until Condemnation is completed.

## 13. Your Duties At and After Termination. When this Agreement terminates for any reason whatsoever:

(a) **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow

conver10.s8 10/94

13

the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.

(b)     **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11(d). We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

(c) **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

(d) **Survival of Certain Provisions.** Sections 3 (h), (i), (m), 7, 8, 11(d), 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.   Your Representations and Warranties.** You expressly represent and warrant to us as follows:

(a) **Quiet Enjoyment.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.

(b) **This Transaction.** You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective franchisees. Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are

relying to enter into this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.  You have obtained all necessary approvals of your owners, Board of Directors and lenders.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject.  Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

(c)  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances.  There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

15.  **Proprietary Rights.**

(a)  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

(b)  **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No goodwill shall attach to any secondary designator that you use.

(c)  **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses,

coover10.s8 10/94

15

under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than the Location or, in the case of a Chain Facility of the same name, in the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

(d) **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

(e) **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

## 16. Relationship of Parties.

(a) **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility

coaver10.a8 10/94

16

for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

(b) **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

### 17. Legal Matters.

(a) **Partial Invalidity.** If any part of this Agreement, for any reason, is declared invalid or unenforceable, the remainder shall not be effected. However, if in our judgment such decision substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

(b) **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

(c) **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

**Vedant, Inc.:**
Your address:          I-80 and Exit 9, Clarion, PA 16214, Fax No. 216-339-7731, Attention: Naresh Patel

**Super 8 Motels, Inc.:**
Our address:          339 Jefferson Road, P.O. Box 278, Parsippany, New Jersey 07054-0278, Fax No. (201) 428-9579, Attention:  Vice President-Franchise Compliance

(d) **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement. You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all

conver10.s8 10/94

17

cases and controversies under this Agreement or between we and you not subject to arbitration.

(e) **Miscellaneous.**  This Agreement will be governed by and construed under the laws of the State of New Jersey.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.  We may unilaterally revise Schedule C under this Agreement.  This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

(f) **Arbitration.**

(1)  We and you will submit any controversy or claim relating to the offer, sale, negotiation, performance, interpretation, enforcement, termination and validity of this Agreement and all related agreements between you and your guarantors, successors and assigns, and us, except claims for indemnification under Section 8, to binding arbitration before the American Arbitration Association under its commercial arbitration rules, or to any other mutually agreeable alternative dispute resolution organization under its rules.  The scope of this agreement to arbitrate includes claims against your and our officers, directors, agents and employees, claims arising under any federal or state law or regulation, and claims by your employees, agents, shareholders, partners, lenders, heirs, personal representatives, spouses, other family members, successors and assigns against us.  This arbitration will be the sole and exclusive remedy for any such controversy or claim.  **A demand for arbitration must be filed by a party within one (1) year after the party discovers the conduct, act, event or occurrence first giving rise to the claim, but no later than two (2) years after the conduct, act, event or occurrence first giving rise to the claim occurs, or the right to any remedy will be deemed forever waived and lost.  The time limit for collecting on our claims for Recurring Fees accruing during the Term will not commence until this Agreement terminates.**

(2)  This arbitration clause will be governed exclusively by the Federal Arbitration Act, as amended.   Arbitration shall take place in the regional office of the American Arbitration Association closest to the Facility before one arbitrator if the amount in controversy is less than $200,000.00 and before three arbitrators if the amount exceeds $200,000.00.  The single arbitrator shall be selected by mutual agreement of the parties; the Association will select the arbitrator using the striking method if the parties cannot agree on the arbitrator within 15 days after the panel information is received by the parties.  The parties will each select one person for the three person panel, who shall then together select the third within 10 days after the second panelist is named.  The Association will select the third if no agreement is so reached as to the third panelist.

(3)  The parties shall bear their own expenses of the arbitration, unless the arbitrators otherwise award the same.   The arbitrators shall have no authority to award punitive or exemplary

conver10.18 10/94

18

damages against either party, or to amend or modify this Agreement. The decision of the single arbitrator, or the majority of the arbitrators of the panel shall be final and conclusive. The award may be confirmed, entered and enforced in any court of competent jurisdiction. This arbitration provision shall be self-executing and shall remain in full force and effect after the termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party, by default or otherwise, notwithstanding the failure to appear. We may file an action in a court of competent jurisdiction to protect the System or the Marks from infringement, unauthorized use or disclosure, or misuse, and we may obtain temporary restraining orders, preliminary and permanent injunctions, or other provisional remedies for such purposes, without awaiting the outcome of an arbitration.

(4) No arbitration under this Agreement shall include, by consolidation, joinder, or in any other manner, any person other than you and us, or persons claiming by or through you and us. To the extent permitted by applicable law, no issue of fact or law shall be given preclusive or collateral estoppel effect in any arbitration except as between the parties themselves or persons in direct privity of contract with them in arbitrations under this Agreement.

(5) The parties waive the right to a jury trial of any issue that is properly the subject of arbitration under this Agreement.

18.     SPECIAL STIPULATIONS

        Notwithstanding anything contained herein to the contrary, the following Special Stipulations shall be controlling over conflicting or inconsistent provisions of this Agreement and shall not be transferable or assignable to Your successor in interest:                    *TPh  v/11/94*

        (A)     (Your Additional Termination Right) You may terminate this Agreement without cause or penalty effective only on the **fifth and tenth** *and Fifteenth* anniversary of the Opening Date provided You give Us at least six (6) months prior written notice of termination and You are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if this Agreement is properly terminated and You perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this paragraph will automatically terminate without notice if and as of the date (i) We send You a notice of termination under this Agreement, or this Agreement automatically terminates, (ii) You fail to cure any default under this Agreement within the time permitted, if any, in the notice of default We send You, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 275 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of less than 275 (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection. **After the third anniversary of the Opening Date, You may also terminate this Agreement if you are not in default and we are (or our successor is) the subject of a bankruptcy reorganization or receivership proceeding that is not dismissed written 90 days after filing. You must give 60 days prior written notice of termination and complete your**

post-termination obligations within 5 days after the effective date of termination. **You will pay no  penalty or Liquidated Damages if you exercise this termination right properly.**

*AND FIFTHTEENTH  11/11/94*

(B)     (<u>Our Additional Termination Right</u>) We may terminate this Agreement without cause or penalty effective only on the **fifth and tenth** anniversary of the Opening Date provided We give You at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  You will pay no Liquidated Damages if this Agreement is terminated and You perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

(C)     (<u>Limit on Advertising & Reservation Fund Increases</u>)  You will not be obligated to pay a System Assessment Fee in excess of 4.0% of Gross Room Sales.  We will not be obligated to provide the services associated with the portion of the System Assessment Fee that you don't pay.

*TPB  11/11/94*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
SUPER 8 MOTELS, INC.:

ATTEST:_____        BY:_____
      (Assistant) Secretary                Vice President

YOU, as FRANCHISEE:
Vedant, Inc.

Attest:_____        By:_____
                                       Naresh Patel
                                       President

conver10.s8 10/94

20

## APPENDIX A

### DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid.  The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, the "VIP Club" credit card program, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Approved Supplier means a vendor authorized by us to provide proprietary or Mark-bearing items, or whose goods and services are deemed to meet applicable System Standards.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of Franchise Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

Effective Date means the date on which we and you have executed of this Agreement, or the date we insert in the Preamble of this Agreement.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which you or your owners sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you

convor10.18 10/94

22

merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 131 Bluebell Drive SW
New Philadelphia, OH 44663, as more fully described in Schedule A.

conver10.s8 10/94

23

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Protected Territory means to be determined.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, other reservation fees and charges, interest and Taxes as stated in Section 7.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4(b).

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

System means a comprehensive system for providing guest lodging facility services as we specify which at present includes: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7(b) to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7(c) of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Transfer Fee means the fee we charge for a transfer under this Agreement.  The Transfer Fee shall be equal to the Initial Fee unless we specify another amount in this Agreement, published policy or in the System Standards Manual.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

## SCHEDULE A

(Legal Description of Facility)

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|----------------------|-------------------------|
| Naresh Patel | 100% | common stock |

PART II:       THE FACILITY:

Primary Designation of Facility: Super 8 Motel

Number of approved guest rooms: 101

Parking facilities (number of spaces, description): 101

Other Amenities and facilities:

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
               COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

conver10.s8 10/94

28

REVISED ON NOVEMBER 11, 1994
SCHEDULE A
SUPER 8 MOTEL
PUNCHLIST SUMMARY
KNIGHTS INN
CLARION, PA
OCTOBER 25, 1994

| | |
|---|---|
| TOTAL ROOMS: | 99 |
| DOUBLE/DOUBLE: | 60 |
| SINGLE/DOUBLE: | 20 |
| SINGLE/DOUBLE W/SOFA: | 10 |
| SINGLE/DOUBLE W/KITT: | 9 |

## PROPERTY CONDITION SUMMARY:

This 17 year old original Knights Inn consists of 7 single story, double loaded guest room buildings constructed of wood. All appear to be structurally sound. The property will require extensive interior and exterior renovations.

Lobby Dimensions:        10' x 25'
Guest Room Dimensions:   12' x 24'

### ITEMS TO BE COMPLETED PRIOR TO ENTERING THE SYSTEM

**PROPERTY EXTERIOR:**                                    **ESTIMATED COST:**

1.  Provide SUPER 8 MOTEL exterior signage. Signage must meet Company standards and be purchased from an approved vendor. **No System signage may be installed until official opening and without approval.** Property needs may vary, therefore cost not included in this estimate. De-identify existing property location.

2.  Property will require a comprehensive exterior renovation plan. Contact your RFS Regional Salesperson for renderings and recommendations; these renderings will become part of this punchlist. Alternative plans may be acceptable providing they are approved by the company. In addition the following is required:
    a.  Replace light fixtures.
    b.  Remove bars on entrance doors.

CLARION, PA;                    KNIGHTS INN
page two

PROPERTY EXTERIOR CONT.:

    c.   Photos of the completed exterior
        renovation must be provided prior to
        the entry inspection.  The Property
        Opening Manager will provide a camera
        to the property for these photos.

    d.   Paint existing swimming pool fence to
        coordinate with new building decor.

    e.   Prior to opening swimming pool ensure
        there is seating for 8 adults.  Price
        not included in estimate.            $ 100,000

PUBLIC AREAS:

1.   Upgrade lobby/front desk area to include:

    a.   Refinish front desk.  Eliminate dark
        laminate.

    b.   Eliminate key rack and install lockable
        key drawers.

    c.   Replace vinyl wall covering to include
        side lobby and restrooms.  Minimum of
        20 oz. required.  An approved light
        texture finish is an acceptable
        alternative.

    d.   Provide decorative window treatment.

    e.   Replace cracked sinks in restrooms.

    e.   Install a SUPER 8 MOTEL showcase in
        lobby area upon official opening.

    f.   Install a portable phone at the front
        desk for manager's use.              4,000

2.   A gas detection system must be installed in
    each area where gas appliances exist in the
    property.  This system must be wired to the
    front desk and managers apartment, if
    applicable, and operational prior to
    entering the System.  A Company approved
    portable unit will be acceptable at this
    location.                          500

3.   Install reservation system equipment per
    Company specifications.  Reservation
    equipment must be purchased.  Cost not
    included in this estimate.

CLARION, PA;                    KNIGHTS INN
page three

## PUBLIC AREAS CONT.:

4.  Facilities to assist the handicapped must be
    provided in accordance with  Local and State
    codes.

5.  Replace ice machine when needed.  Super 8
    Motels require sanitary dispensing type ice
    machines.  One ice machine will be
    acceptable for this location.                       3,000

6.  Upgrade meeting room to include:
    a.   Replace vinyl wall covering.  Minimum
         of 20 ounces required.  An approved
         light texture finish is an acceptable
         alternative.  Remove all wood trim.
    b.   Replace furniture package.
    c.   Remove swag lamps.                             1,500

## GUEST ROOMS/BATHS:

1.  Super 8 Motels require electronic/magnetic
    strip locksets for all new construction
    properties and anticipates that within 3 to
    5 years they will be adopted as a Super 8
    Motel standard for all properties.  You
    should take this into consideration if you
    anticipate and/or are required to change or
    upgrade your existing locking system.
    Current indicator locks are unacceptable.
    In the interim, replacing these deadbolts
    with a 1" throw separate keyed deadbolt
    (keyed for emergency access only) is
    acceptable providing it meets state and
    local codes.                                        2,000

2.  Install a non-keyed, 1" deadbolt lock in all
    connecting doors in addition to existing
    knob latch.  Operating knobs must be located
    on room side only with flush plates between
    doors.                                              400

3.  Eliminate lock trim handles.  Cost not
    included in estimate.

4.  Replace entrance door room numbers with an
    approved plaque type.                              1,500

CLARION, PA;                    KNIGHTS INN
page four

<u>GUEST ROOMS/BATHS CONT.:</u>
5.    Renovate guest rooms to include:
      a.    Eliminate all dark trim from walls and
            ceilings except doors and windows.
      b.    Replace vinyl wall covering to include
            bath area.  Minimum of 12 ounces
            required.  An approved light texture
            finish is an acceptable alternative.
      c.    Paint rooms to include doors, trim and
            ceilings.
      d.    Provide pictures. A minimum of one
            glass front, framed picture per
            headboard, two in a King bedded room is
            required.  Minimum size required is
            20" x 16".
      e.    Replace carpet as in 227 to eliminate
            any which are worn. Minimum 28 oz. cut
            pile, wall to wall carpet with pad is
            required.  Recommend 30 oz.
      f.    Replace casegoods to include credenzas,
            headboards, wall mirrors, desks,
            writing tables and nightstands.
            Nightstands, credenzas and desks must
            be free standing.  All casegoods must
            coordinate.
      g.    Replace leisure chairs.  Provide a
            minimum of two upholstered arm chairs.
            One arm chair may be substituted with
            a desk chair.  Vinyl is not acceptable.
      h.    Replace sleeper sofas.
      i.    Replace lamp package.  Provide 2 lamps
            per headboard wall, credenza lamp and a
            floor lamp at leisure area.  Eliminate
            all hanging lamps.  An acceptable
            option would be to install ceiling
            lights.
      j.    Replace HVAC covers as in 227.
      k.    Replace bedspreads and drapes where
            worn, torn, or severely stained.
            Quilted bedspreads and decorative
            blackout drapes are required.  Drapes
            and bedspreads must coordinate.
      l.    Replace mattress and boxsprings to
            eliminate any which have lost support.
      m.    A minimum of 40% of guest rooms must be
            prepared and designated as non-smoking
            rooms.                                186,600

CLARION, PA;                    KNIGHTS INN
page five

## GUEST ROOMS/BATHS CONT.:
6.    Renovate bath area to include the following:
    a.    Remove or replace dated vanity
          cabinets.  Cost for replacement.
    b.    Replace vanity mirror.  A one piece
          mirror running the full length of the
          vanity is required.
    c.    Eliminate in ceiling lighting.  Provide
          a fluorescent vanity light.
    d.    Replace towel racks with a bar or shelf
          and bar combination.
    e.    Replace bath flooring.  Ceramic tile or
          sheet vinyl (minimum .085 gauge) are
          acceptable options. AS NEEDED TO ELIMINATE      44,100
          ANY THAT IS STAINED OR WORN. 1/11/94 TB

## BRAND STANDARDS:

      Property must comply with Brand Standards,
      including but not limited to, employee
      uniform package, amenities, logo'd supplies,
      and all signage/graphics.  Logo'd supplies
      must be available at the entry inspection
      but may not be placed in the guest rooms
      until official opening.                               5,100


## RECOMMENDATIONS:

1.    Set up a display in the lobby to show the
      architectural renderings and interior design
      color boards for the proposed work and
      completion dates.                                   _____

2.    Provide informational signage to inform
      guests that work is underway and direct
      guest away from the construction area.              _____

3.    Renovate a couple of rooms to show guests
      and potential customers what they can expect
      in the future.                                      _____

                    PROPERTY TOTAL:           $ 348,700


**HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND WILL NOT BE CONSIDERED DURING FUTURE EVALUATION.  ANY AND
ALL REVISIONS TO THIS PUNCHLIST MUST BE MADE AND APPROVED BY THE
QUALITY ASSURANCE DEPARTMENT.**

## SCHEDULE C

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period.

Notwithstanding the above, upon 60 days written notice, after the tenth (10th) anniversary of the Effective Date of this Agreement, and at any later times, System Assessment Fee may be increased, in our sole discretion, on a System-wide basis to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

We will not seek or accept indemnity, reimbursement or subrogation against Franchisee for any amount paid under this Guaranty unless and until 367 days have elapsed from the date you receive payment of such amount.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:                                        Guarantors:

_Brenda J Keller_                    _Patel_____(Seal)
                                     Naresh C. Patel

_____              _____(Seal)

conver10.a8 10/94

30

**EXHIBIT B**

Schedule "B" of the Franchise Agreement is hereby amended as follows:

1.  Owners (names, addresses and percentage equity interests; attached separate exhibit if necessary):

      a.    Of Assignee:                                       Ownership %

| | | Ownership % |
|---|---|---|
| Name: | Pramod A. Patel | 51.00% |
| Address: | 6542 Ethel Street NW | |
| City, State and Zip Code: | Canton, OH 44718 | |
| | | |
| Name: | Hemlata P. Patel | 49.00% |
| Address: | 6542 Ethel Street NW | |
| City, State and Zip Code: | Canton, OH 44718 | |

## GUARANTY

As an inducement to Super 8 Motels, Inc. (the "Company") to execute the foregoing Assignment and Assumption Agreement, the undersigned, jointly and severally, hereby irrevocably and unconditionally (i) warrant to the Company and its successors and assigns that all of Assignee's representations and warranties in the Assignment and Assumption Agreement are true and correct as stated, and (ii) guaranty that all of Assignee's obligations as the substituted Franchisee (hereinafter referred to as "Franchisee") under the Franchise Agreement, including any amendments thereto whenever made (the "Agreement"), will be punctually paid and performed.

Upon default by Franchisee and notice from the Company, the undersigned will immediately make each payment and perform or cause Franchisee to perform, each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, the Company may without notice to the undersigned extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement, the giving of notice or demand by the Company for payment or performance by Franchisee, and acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the date of the above Agreement.

WITNESSES:

GUARANTORS:

_____ (Seal)
Pramod A. Patel

_____ (Seal)
Hemlata P. Patel

# Exhibit C

## GUARANTY

As an inducement to Super 8 Motels, Inc. (the "Company") to execute the foregoing Assignment and Assumption Agreement, the undersigned, jointly and severally, hereby irrevocably and unconditionally (i) warrant to the Company and its successors and assigns that all of Assignee's representations and warranties in the Assignment and Assumption Agreement are true and correct as stated, and (ii) guaranty that all of Assignee's obligations as the substituted Franchisee (hereinafter referred to as "Franchisee") under the Franchise Agreement, including any amendments thereto whenever made (the "Agreement"), will be punctually paid and performed.

Upon default by Franchisee and notice from the Company, the undersigned will immediately make each payment and perform or cause Franchisee to perform, each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, the Company may without notice to the undersigned extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement, the giving of notice or demand by the Company for payment or performance by Franchisee, and acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the date of the above Agreement.

WITNESSES:

GUARANTORS:

_____ (Seal)
Pramod A. Patel

_____ (Seal)
Hemlata P. Patel

# Exhibit
# D



# WYNDHAM

## HOTEL GROUP

Contracts Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

September 24, 2014                                        VIA OVERNIGHT COURIER

Vedantkush, Inc.
6542 Ethel St., NW
Canton, OH 44718
Attn: Pramod Patel
330-305-9298

Re:     **NOTICE OF EXPIRATION** of the Franchise for Super 8® System Unit #8417-99404-3
        located in Clarion, PA, the ("Facility")

Dear Mr. Patel:

Super 8 Worldwide, inc.("we" or "us") and Vedantkush, Inc. ("you" or your") entered into a
Assignment and Assumption Agreement, dated December 3, 2002 (the "Agreement") for the
Facility. In accordance with the terms of the Agreement, please be advised that the Agreement will
expire on June 22, 2015 ("Termination Date") as provided in Section 5.   Please note that, because
your Agreement is expiring effective on the Termination Date, you will not be available for booking
in our central reservation system and third party websites beyond that date.

If you would like to discuss the re-licensing process, please contact Albert Fornini of the Retention
& Re-Licensing Group at (973) 753-8978.

Sincerely,

Jeanine Mahan
Director
Contracts Administration

cc:     John Valletta
        Albert Fornini

# WYNDHAM

## HOTEL GROUP



      

        

FOLD HERE

NANCY CHARNEY
(973) 753-7202
WYNDHAM HOTEL GROUP - 22 SYLVA
22 SYLVAN WAY
PARSIPPANY NJ 07054

0.0 LBS    LTR        1 OF 1

SHIP TO:
PRAMOD PATEL
330-305-9298
VEDANTKUSH, INC.
6542 ETHEL ST. NW
**CANTON   OH 44718-4200**

# OH 447 9-01

## UPS 2ND DAY AIR
TRACKING #: 1Z 224 45X 02 9380 7718

**2**

BILLING: P/P

Reference # 1: 006-5072

C6 14.6.05    WWTRAD 34.0A 07/2014

UPS CampusShip: Shipment Label

Page 1 of 1

## UPS CampusShip: View/Print Label

1. Ensure there are no other shipping or tracking labels attached to your package. Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. Fold the printed sheet containing the label at the line so that the entire shipping label is visible. Place the label on a single side of the package and cover it completely with clear plastic shipping tape. Do not cover any seams or closures on the package with the label. Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. GETTING YOUR SHIPMENT TO UPS
UPS locations include the UPS Store®, UPS drop boxes, UPS customer centers, authorized retail outlets and UPS drivers.
Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
Hand the package to any UPS driver in your area.
Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.

Customers with a Daily Pickup
Your driver will pickup your shipment(s) as usual.

# Exhibit

# E



# WYNDHAM
## HOTEL GROUP

Contracts Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

May 5, 2015

**VIA OVERNIGHT COURIER**

Vedantkush, Inc.
6542 Ethel Street, NW
Canton, OH 44718
Attn: Pramond Patel
330-305-9298

Re:   **FINAL NOTICE OF EXPIRATION** of the Franchise for Super 8® System Unit #08417-99404-03 located in Clarion, PA (the "Facility")

Dear Mr. Patel:

Super 8 Worldwide, Inc. ("we" or "us") and Vedantkush, Inc. ("you" or "your") entered into a Assignment Assumption Agreement, dated December 3, 2002 (the "Agreement") for the Facility. The Agreement will expire on June 22, 2015 (the "Termination Date"). We would like to take this opportunity to thank you for your business.

The Agreement requires you to perform certain post-termination obligations. In addition to other obligations specified in the Agreement, by no later than fourteen days after the Termination Date, you must (a) remove all signage and other items bearing the Super 8 Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Super 8 facility; and (d) remove the Super 8 Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines. You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified. You must immediately return to us all training documents, operating manuals and other proprietary material. The de-identification procedures are specified in the attachment to this letter.

You are also responsible for payment of all fees under the Agreement through the date you complete the de-identification process. We estimate that, as of May 4, 2015 you owe us $32,567.91 in Recurring Fees. We have enclosed an itemized statement for your convenience. You must also honor any advance reservations, including group reservations, made for the Facility before the



    

         

# 8417-99404-03
Clarion, PA-SUP
Page 2

Termination Date at the rates and terms set when the reservations were made.  You must
also timely pay all travel agent commissions.

Please note that, because your Agreement is terminating effective on the Termination Date, you will
lose your right to continue to use the seamless interface version of your property management
system.  You must now make your own arrangements with the software vender for a new license, as
stated in your Software and Services Agreement.

If within the time period described above, you do not timely remove the exterior signage which
bears the Super 8 trade name, trademarks and service marks we may exercise our rights under the
Agreement and send an independent contractor to the Facility to remove all such signage at and
around the Facility.  The cost of sign removal will be added to your final invoice from us.  If you
object to the removal of the signage by our independent contractor, you must notify us within 14
days of the date of this letter.  Otherwise, we will confirm the date and time that our contractor will
remove the signage from the Facility in a separate letter to you.

This letter is written without waiver of our rights, all of which are expressly reserved.  If you have any
questions or need assistance with your account balance information, please contact Megan McElroy,
Settlement Coordinator, at (973) 753-7494.

Yours truly,

Jeanine Mahan
Director
Contracts Administration

cc:     Mike Mueller
        Glenn Bisbing

# ITEMIZED STATEMENT

Report Date: 04-May-2015



| | | |
|---|---|---|
| As of Date (DD-MMM-YYYY) | : | 04-May-2015 |
| Customer No | : | 08417-99404-03-SUP |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |
| | | |
| Customer No | : | 08417-99404-03-SUP |
| Address | : | 6542 ETHEL STREET |
| | | NW,CANTON,OH,44718-4200,US |
| As of Date | : | 04-May-2015 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| JUN-2014 | 42925156 | 06/30/2014 | Actual-1000A-ROYALTY FEE | | 1,692.08 | 0.00 | 214.91 | 1,906.99 |
| | | | | Sub Total: | 1,692.08 | 0.00 | 214.91 | 1,906.99 |
| JUL-2014 | 42953084 | 07/31/2014 | Actual-1000A-ROYALTY FEE | | 2,222.20 | 0.00 | 247.76 | 2,469.96 |
| | 42953086 | 07/31/2014 | Actual-1215A-ADVERTISING | | 1,666.65 | 0.00 | 185.83 | 1,852.48 |
| | | | | Sub Total: | 3,888.85 | 0.00 | 433.59 | 4,322.44 |
| AUG-2014 | 42984458 | 08/31/2014 | Actual-1000A-ROYALTY FEE | | 2,028.13 | 0.00 | 194.70 | 2,222.83 |
| | 42984648 | 08/31/2014 | Actual-1215A-ADVERTISING | | 1,521.10 | 0.00 | 148.05 | 1,667.15 |
| | | | | Sub Total: | 3,549.23 | 0.00 | 340.75 | 3,889.98 |
| SEP-2014 | 43012930 | 09/30/2014 | Actual-1000A-ROYALTY FEE | | 1,887.21 | 0.00 | 152.86 | 2,040.07 |
| | 43012931 | 09/30/2014 | Actual-1215A-ADVERTISING | | 1,415.40 | 0.00 | 114.65 | 1,530.05 |
| | | | | Sub Total: | 3,302.61 | 0.00 | 267.51 | 3,570.12 |
| OCT-2014 | 10768355 | 10/02/2014 | GUEST SATISFACTION | | 131.00 | 0.00 | 10.48 | 141.48 |
| | 10768887 | 10/02/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 12.80 | 172.80 |
| | 10772404 | 10/16/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 11.68 | 171.68 |
| | 10772446 | 10/16/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 11.68 | 171.68 |
| | 10772904 | 10/23/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 11.12 | 171.12 |
| | 43039172 | 10/31/2014 | Actual-1000A-ROYALTY FEE | | 1,585.99 | 0.00 | 103.88 | 1,689.87 |
| | 43039730 | 10/31/2014 | Actual-1215A-ADVERTISING | | 1,189.49 | 0.00 | 77.92 | 1,267.41 |

Page 1 of 3

(Page 4 of 6)

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | Sub Total: | | 3,548.48 | 0.00 | 239.56 | 3,788.04 |
| | | | | | | | | |
| NOV-2014 | 10776040 | 11/06/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 10.00 | 170.00 |
| | 10778893 | 11/06/2014 | GUEST SATISFACTION | | 120.43 | 0.00 | 7.54 | 127.97 |
| | 43069419 | 11/30/2014 | Actual-1000A-ROYALTY FEE | | 967.55 | 0.00 | 48.86 | 1,016.41 |
| | 43069757 | 11/30/2014 | Actual-1215A-ADVERTISING | | 725.66 | 0.00 | 36.64 | 762.30 |
| | | | Sub Total: | | 1,973.64 | 0.00 | 103.04 | 2,076.68 |
| | | | | | | | | |
| DEC-2014 | 10780919 | 12/03/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 7.84 | 167.84 |
| | 43075224 | 12/31/2014 | 5096A-WYNGUEST SW MAINT | | 499.79 | 29.98 | 18.54 | 548.31 |
| | 43098038 | 12/31/2014 | Actual-1215A-ADVERTISING | | 682.24 | 0.00 | 23.87 | 706.11 |
| | | | Sub Total: | | 1,342.03 | 29.98 | 50.25 | 1,422.26 |
| | | | | | | | | |
| JAN-2015 | 1529276 | 01/26/2015 | GDS & INTERNET BKGS | | 138.20 | 0.00 | 3.04 | 141.24 |
| | 43103027 | 01/31/2015 | 5096A-WYNGUEST SW MAINT | | 499.75 | 29.98 | 10.33 | 540.06 |
| | 43103940 | 01/31/2015 | 5715A-HughesNet VSAT | | 160.00 | 9.60 | 3.30 | 172.90 |
| | 43124776 | 01/31/2015 | Accrual-1215A-ADVERTISING | * | 525.99 | 0.00 | 10.26 | 536.25 |
| | 43126888 | 01/31/2015 | Accrual-1000A-ROYALTY FEE | * | 701.32 | 0.00 | 13.68 | 715.00 |
| | TM0529276 | 01/26/2015 | MEMBER BENEFIT COMM | | 35.36 | 0.00 | 0.78 | 36.14 |
| | | | Sub Total: | | 2,060.62 | 39.58 | 41.39 | 2,141.59 |
| | | | | | | | | |
| FEB-2015 | 10789630 | 02/11/2015 | GUEST SATISFACTION | | 38.46 | 0.00 | 0.54 | 39.00 |
| | 10789674 | 02/11/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 2.24 | 162.24 |
| | 1536239 | 02/24/2015 | GDS & INTERNET BKGS | | 77.70 | 0.00 | 0.58 | 78.28 |
| | 26372549 | 02/22/2015 | WYNREWARDS 5% | | 135.58 | 0.00 | 1.15 | 136.73 |
| | 30994864 | 02/10/2015 | 2015 AH&LA Fees | | 198.00 | 0.00 | 0.00 | 198.00 |
| | 31004322 | 02/28/2015 | Q/A REINSPECTION | | 1,900.00 | 0.00 | 10.45 | 1,910.45 |
| | 43130206 | 02/28/2015 | 5715A-HughesNet VSAT | | 160.00 | 9.60 | 0.93 | 170.53 |
| | 43131966 | 02/28/2015 | 5096A-WYNGUEST SW MAINT | | 499.79 | 29.98 | 2.91 | 532.68 |
| | 43147440 | 02/28/2015 | Accrual-1000A-ROYALTY FEE | * | 507.80 | 0.00 | 2.79 | 510.59 |
| | 43147441 | 02/28/2015 | Accrual-1215A-ADVERTISING | * | 380.85 | 0.00 | 2.09 | 382.94 |
| | | | Sub Total: | | 4,058.18 | 39.58 | 23.68 | 4,121.44 |
| | | | | | | | | |
| MAR-2015 | 26379707 | 03/22/2015 | WYNREWARDS 5% | | 112.65 | 0.00 | 0.00 | 112.65 |
| | 31011119 | 03/31/2015 | Q/A REINSPECTION | | 1,900.00 | 0.00 | 0.00 | 1,900.00 |
| | 43157080 | 03/31/2015 | 5096A-WYNGUEST SW MAINT | | 499.79 | 29.98 | 0.00 | 529.77 |
| | 43158203 | 03/31/2015 | 5715A-HughesNet VSAT | | 160.00 | 9.60 | 0.00 | 169.60 |
| | 43178765 | 03/31/2015 | Accrual-1215A-ADVERTISING | * | 305.97 | 0.00 | 0.00 | 305.97 |
| | 43181038 | 03/31/2015 | Accrual-1000A-ROYALTY FEE | * | 407.96 | 0.00 | 0.00 | 407.96 |
| | | | Sub Total: | | 3,386.37 | 39.58 | 0.00 | 3,425.95 |

Page 2 of 3

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|----------|-------------|--------------|-------------|---------|---------|-----------|----------------|-------|
| APR-2015 | 26384105 | 04/22/2015 | WYNREWARDS 5% | | 188.37 | 0.00 | 0.00 | 188.37 |
| | 43186238 | 04/30/2015 | 5715A-HughesNet VSAT | | 160.00 | 9.60 | 0.00 | 169.60 |
| | 43187347 | 04/30/2015 | 5095A-WYNGUEST SW MAINT | | 499.79 | 29.98 | 0.00 | 529.77 |
| | 43208731 | 04/30/2015 | Accrual-1000A-ROYALTY FEE | | 580.96 | 0.00 | 0.00 | 580.96 |
| | 43208732 | 04/30/2015 | Accrual-1215A-ADVERTISING | | 435.72 | 0.00 | 0.00 | 435.72 |
| | | | Sub Total: | | 1,864.84 | 39.58 | 0.00 | 1,904.42 |
| | | | Grand Total: | | 30,664.93 | 188.30 | 1,714.68 | 32,567.91 |

Requested By:  Lisa Maiella

\* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

Page 3 of 3

UPS CampusShip: Shipment Receipt                                         Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 05 May 2015**         **Tracking Number:**         1Z22445X0299636302

| **1** | **Address Information** |
| --- | --- |

| Ship To: | Ship From: | Return Address: |
| --- | --- | --- |
| Vadantkush, Inc. | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Premond Patel | Lisa Malella | Lisa Malella |
| 6542 Ethel Street, NW | 22 Sylvan Way | 22 Sylvan Way |
| CANTON OH 447184200 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Telephone:330-305-9298 Residential | Telephone:(973) 753-7206 | Telephone:(973) 753-7206 |

| **2** | **Package Information** |
| --- | --- |

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
| --- | --- | --- | --- |
| 1.  Letter<br>(Letter billable) | UPS Letter | | Reference # 1 - 006-5072 |

| **3** | **UPS Shipping Service and Shipping Options** |
| --- | --- |

| Service: | UPS 2nd Day Air |
| --- | --- |
| Guaranteed By: | End of Day Thursday, May 7, 2015 |
| Shipping Fees Subtotal: | 19.76 USD |
| Transportation | 15.45 USD |
| Fuel Surcharge | 0.81 USD |
| Residential Surcharge | 3.50 USD |

| **4** | **Payment Information** |
| --- | --- |

| Bill Shipping Charges to: | Shipper's Account 22445X |
| --- | --- |

Charges:                                                                    19.76 USD

**A discount has been applied to the Daily rates for this shipment**

Negotiated Charges:                                                         9.25 USD
Total Charges:                                                              9.25 USD

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.